

# NUMBERS

## 13-10-00254-CR
## 13-10-00255-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JESUS ZAVALA,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

---

### On appeal from the 377th District Court
### of Victoria County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Garza

At the beginning of his jury trial, appellant, Jesus Zavala, pleaded guilty to two counts of unlawful delivery of more than one-fourth ounce but less than five pounds of marihuana, a state jail felony offense. *See* TEX. HEALTH & SAFETY CODE ANN. §

481.120(a), (b)(3) (West 2010).  After trial, the jury found him guilty of one count of engaging in criminal activity, a second-degree felony.  *See* TEX. PENAL CODE ANN. § 71.02(a)(5), (b) (West Supp. 2010).[1]  The trial court imposed punishment at (1) two years' confinement in state jail and a $500.00 fine for each count of unlawful delivery of marihuana, and (2) eighteen years' imprisonment and a $9,000.00 fine for engaging in criminal activity.  The court ordered the sentences to run concurrently.[2]  By four issues, appellant contends:  (1) the evidence is insufficient to support his conviction for engaging in criminal activity; (2) the trial court erred in admitting certain evidence; (3) juror misconduct occurred when a juror engaged in an unauthorized conversation with a State witness; and (4) the State engaged in improper jury argument.  We affirm.

## I. BACKGROUND

Appellant was indicted for engaging in organized criminal activity as follows:

> On or about [June 9, 2009], . . . [Zavala] as a principal or party . . . did then and there, as a member of a criminal street gang, to wit: "Hermanos Pistoleros Latinos" aka "Hermandad Pistoleros Latinos" and "HPL" did then and there commit the offense of POSSESSION OF MARIJUANA;
>
> And [Zavala] as a member of a criminal street gang[,] to wit: "Hermanos Pistoleros Latinos" aka "Hermandad Pistoleros Latinos" and "HPL" did then and there intentionally or knowingly possess marijuana in an amount of fifty pounds or less but more than 5 pounds through forgery, fraud, misrepresentation, or deception.

Trial testimony established that appellant's brother, Raul Gonzales, was the "general" for the Victoria, Texas region of the criminal street gang known as Hermanos

---

[1] Although certain subsections of section 71.02 have been amended, the amendments are inapplicable to this case, and therefore we cite the current version of the statute.  Appellant was charged with four counts of engaging in organized criminal activity.  During trial, the State abandoned counts one and two and the trial court granted an instructed verdict as to count three.

[2] Appellant pleaded guilty to two counts of unlawful delivery of marihuana in appellate cause number 13-10-254-CR, and the jury found him guilty of engaging in organized criminal activity in appellate cause number 13-10-255-CR.  The cases were consolidated for trial and on appeal.

Pistoleros Latinos ("HPL").[3]   Bryan Jimenez, a member of HPL who became an undercover informant for police after his arrest for possession of marihuana on May 23, 2009, lived next door to appellant.  Jimenez testified that on June 9, 2009, he observed appellant and Raul moving a large quantity of marihuana into appellant's house. Jimenez contacted Sam Eyre, then a sergeant with the Special Crimes Unit of the Victoria Police Department, and Jimenez's supervisor.  Jimenez went into appellant's house and observed appellant, Raul, and Raul's son, Jeremiah Gonzales, repackaging the marihuana into smaller zip-lock bags.  Jimenez reported this information to Sergeant Eyre.

Later that day, Jimenez testified that he made a controlled purchase of a half pound of marihuana from appellant at appellant's house.  Jimenez was wearing a "body wire" during the transaction and turned the marihuana over to the police immediately after the purchase.  Later that same evening, Jimenez testified that he observed marihuana being loaded from appellant's house into Raul's Yukon sport-utility vehicle. Jimenez reported this information to the police.  Sergeant Eyre and several other officers set up surveillance of appellant's residence.  The officers observed the Yukon leaving appellant's residence.  Although the officers did not know who was inside the vehicle, Jimenez testified that the occupants were Raul and Jeremiah.  Acting on information from Jimenez, Sergeant Eyre requested that a patrol officer execute a traffic stop of the Yukon.  Shortly after leaving appellant's residence, Officer Marc Pullin stopped the Yukon for a traffic violation.  Raul and Jeremiah were arrested for

_____

[3] The criminal street gang was also referred to as "Hermandad Pistoleros Latinos."  We note that in an earlier opinion, this Court affirmed Raul Gonzales's convictions for possession of marihuana and organized criminal activity.  See Gonzales v. State, No. 13-09-640-CR, 2011 Tex. App. LEXIS 9231, at *2 (Tex. App.—Corpus Christi Nov. 22, 2011, no pet.) (mem. op., not designated for publication).

possession of marihuana. Jimenez testified that approximately an hour after Raul and Jeremiah left appellant's house, appellant told him about the arrest.

Jimenez testified that on June 14, 2009, he made another controlled purchase of a half pound of marihuana from appellant at appellant's house. Jimenez was wearing a "body wire" during the transaction.

## II. SUFFICIENCY OF THE EVIDENCE

By his first issue, appellant contends that the evidence is legally and factually insufficient to support his conviction for engaging in organized criminal activity. Specifically, appellant argues that the evidence is insufficient to establish that: (1) he intended to participate in a criminal street gang; (2) he was involved in the distribution of drugs on June 9; and (3) the substance confiscated on June 9 was marihuana. Appellant also argues that the evidence was insufficient to corroborate the testimony of accomplice and covert-informant witnesses as required to sustain his conviction for the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005) (requiring accomplice witness testimony to be corroborated by evidence tending to connect the defendant with the offense committed); *see id.* art. 38.141 (requiring covert witness testimony to be corroborated by evidence tending the connect the defendant with the offense committed). Appellant's first issue thus raised two distinct legal theories, and we will address each theory in turn. *See Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (distinguishing sufficiency review from review under accomplice-witness rule); *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.) ("A challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict as a whole.").

4

### A. Standard of Review and Applicable Law

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902–03, 912 (Tex. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, we review claims of evidentiary insufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Id.* at 906–07, 912. Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898–99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.* (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)). We must resolve any inconsistencies in the testimony in favor of the verdict. *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

In reviewing the legal sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense, and we may rely on actions of the appellant that show an understanding and common design to do the prohibited act. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Each fact need not point directly and independently to the appellant's guilt, so long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

The Texas Court of Criminal Appeals recently laid out the standard of review for sufficiency of non-accomplice evidence as follows:

> [U]nder Texas Code of Criminal Procedure Article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by other, non-accomplice evidence that tends to connect the accused to the offense. Evidence that the offense was committed is insufficient to corroborate an accomplice witness's testimony. And an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person.
>
>     \* \* \* \*
>
> When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense. The sufficiency of non-accomplice evidence is judged according to the particular facts and

6

circumstances of each case. The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the fact[-]finder's resolution of the evidence. Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence.

*Smith v. State*, 332 S.W.3d 425, 439, 442 (Tex. Crim. App. 2011) (internal citations omitted); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). Evidence that the defendant was in the company of the accomplice near the time or place of the offense is also proper corroborating evidence. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, then the requirement of article 38.14 has been fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999).

Article 38.141 of the Texas Code of Criminal Procedure, entitled "Testimony of Undercover Peace Officer or Special Investigator," provides:

(a) A defendant may not be convicted of an offense under Chapter 481, Health and Safety Code, on the testimony of a person who is not a licensed peace officer or a special investigator but who is acting covertly on behalf of a law enforcement agency or under the color of law enforcement unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

(b) Corroboration is not sufficient for purposes of this article if the corroboration only shows commission of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.141(a), (b) (West 2005).

7

We review a claim challenging the sufficiency of evidence to corroborate the testimony of a covert witness under the same statutorily required standard that is applied to a challenge of the testimony of an accomplice. *Malone v. State*, 253 S.W.3d 253, 258 (Tex. Crim. App. 2008); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (pertaining to corroboration required of accomplice witness). Under this standard, a reviewing court must exclude the testimony of a covert agent from consideration when weighing the sufficiency of corroborating evidence under article 38.141(a) and examine the remaining evidence to determine whether the evidence "tends to connect" the defendant to the commission of the offense. *Malone*, 253 S.W.3d at 258. In reviewing the specific facts of each case to determine whether evidence is sufficient to corroborate covert-agent testimony, we may not consider accomplice-witness testimony that needs to be corroborated under article 38.14. *Patterson v State*, 204 S.W.3d 852, 859 (Tex. App.—Corpus Christi 2006, pet. ref'd) (en banc).

Section 71.02(a) of the penal code states, in pertinent part:

§ 71.02  Engaging in Organized Criminal Activity

(a) A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one or more of the following:

. . . .

(5)  . . . unlawful possession of a controlled substance or dangerous drug . . . .

TEX. PENAL CODE ANN. § 71.02(a)(5) (West Supp. 2010). Section 71.01 of the penal code defines "criminal street gang" as "three or more persons having a common identifying sign or symbol or an indentifiable leadership who continuously or regularly

8

associate in the commission of criminal activities." *Id.* § 71.01(d) (West 2003). Thus, under section 71.02(a), a defendant is guilty of engaging in organized criminal activity when the State proves the first element, that the defendant committed a specific offense that is listed under that chapter—here, possession of a controlled substance—and the second element, that the defendant committed that offense "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang." *See id.* § 71.02(a)(5). Appellant challenges the sufficiency of the evidence concerning both elements: (1) the underlying offense that he unlawfully possessed marihuana; and (2) that he committed the offense with the intent to participate as a member of a criminal street gang.

We note that the indictment charged appellant with the offense of engaging in organized criminal activity "as a principal or party as defined in §7.02 of the Texas Penal Code . . . ." *See* TEX. PENAL CODE ANN. § 7.01(a) (West 2003) (stating that a person is guilty as a party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both"). A person "is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). In determining whether an individual is a party to an offense and bears criminal responsibility, the court may look to events before, during, and after the commission of the offense. *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987). Participation in an enterprise may be inferred from the circumstances and need not be shown by direct evidence. *Id.* Circumstantial evidence may be sufficient to show

9

that one is a party to an offense. *Id.*

Here, the jury charge did not include an instruction on the law of parties. However, using a hypothetically correct jury charge, we must determine whether the evidence is sufficient to prove that appellant committed the offense of possession of marihuana "with the intent to . . . participate . . .as a member of a criminal street gang"[4] and that appellant was criminally responsible for the possession of marihuana committed by Raul and Jeremiah, if while acting with intent to promote or assist the commission of the offense, appellant solicited, encouraged, directed, aided, or attempted to aid Raul and Jeremiah to commit the offense.

A person commits the offense of unlawful possession of marihuana if he knowingly or intentionally possesses a usable quantity of marihuana without legal authority to do so. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121 (West 2010). To prove the unlawful-possession-of-a-controlled-substance element, the State was required to prove appellant (1) exercised control, management, or care over the marihuana; and (2) knew the substance possessed was contraband. *See Blackman v. State*, 350 S.W.3d 588, 594 (Tex. Crim. App. 2011). Because appellant was not in exclusive possession of the vehicle where the marihuana was found, the State was also required to prove beyond a reasonable doubt that appellant's connection to the marihuana "was more than just fortuitous." *See id.* (quoting *Poindexter v. State*, 153

---

[4] We also note that the indictment omitted the requisite mental state, requiring only that appellant commit the underlying offense "as a member of a criminal street gang." The jury charge, however, correctly instructed the jury that "a person commits the offense of ENGAGING IN ORGANIZED CRIMINAL ACTIVITY if, with intent to participate as a member of a criminal street gang, the person intentionally or knowingly possesses a usable quantity of marijuana through deception and the amount of marijuana possessed is 50 pounds or less but more than 5 pounds." *See Curiel v. State*, 243 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (noting that even if both indictment and jury charge omit the requisite mental state, sufficiency review is conducted using a hypothetically correct jury charge).

S.W.3d 402, 406 (Tex. Crim. App. 2005)). To prove that a defendant is criminally responsible for possession of a controlled substance as a party, the evidence must show that (1) another person possessed the contraband and (2) with the intent to promote or assist the commission of the offense, appellant solicited, encouraged, directed, aided, or attempted to aid the other's possession. *Roberson v. State*, 80 S.W.3d 730, 735 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see* TEX. PENAL CODE ANN. § 7.02(a)(2). With respect to the underlying offense, appellant challenges the evidentiary sufficiency of the "unlawful possession" element and that the substance confiscated on June 9, 2009 was, in fact, marihuana.

## B. Legal Sufficiency

The State presented the testimony of numerous witnesses, including two accomplice witnesses,[5] one covert witness (Jimenez), and law enforcement officers involved in the case. The defense presented no witnesses. We detail the pertinent evidence below.

### 1. The Evidence

### a. Elvis Segura[6]

Segura testified that at the time of his arrest, he was a "sergeant" in the HPL. The HPL is involved in the business of selling narcotics and other criminal activity. HPL "rules" dictate that if a member cooperates with law enforcement, the member and/or his family members will be killed. Segura stated that he would be "in fear" "[f]or the rest

---

[5] The State planned to present the testimony of accomplice witness Jeremiah Gonzales, who had made an agreement with the State to testify. However, Jeremiah breached the agreement and refused to testify.

[6] It is undisputed that Segura and Alfredo DeLeon were accomplices. Each made an agreement with the State in exchange for their testimony.

11

of [his] life." Segura purchased marihuana twice from appellant at appellant's house. Segura frequently visited Jimenez's home and observed traffic related to the sale of marihuana at appellant's house. Regular shipments of HPL marihuana were broken down into smaller packages at Raul's or appellant's house. HPL guns were also stored at appellant's house. HPL keeps records of marihuana sales and transactions by its members. Appellant obtained marihuana from Raul, like other HPL members. On about six occasions, Segura saw appellant pick up marihuana from Raul's house. Appellant sold marihuana for Raul.

On May 23, 2009, Raul ordered Segura and Jimenez to pick up a package at a designated residence and bring it to Raul at appellant's house.[7] Segura and Jimenez did as instructed; after Jimenez picked up the package and got back in Segura's truck, Segura began driving toward appellant's house. The police had observed the retrieval of the package and shortly thereafter, stopped Segura's vehicle and arrested Segura, his wife, Teresa, and Jimenez for possession of marihuana. In June 2009, Segura testified that appellant had been an "associate," but was not yet a "prospecto" in HPL.

On cross-examination, Segura stated that on May 23, 2009, appellant was not a member of HPL, but was "just an associate." Because appellant was not a member, he did not attend HPL meetings; however, it was discussed at meetings that appellant was moving marihuana for Raul. The marihuana that appellant sold to Segura belonged to HPL. On re-direct examination, Segura stated that appellant regularly spent time with HPL members, was involved with and aided HPL in its business, shared in the risks and profits associated with HPL's criminal enterprises, stored guns and marihuana for HPL,

---

[7] Segura's wife, Teresa, was with him when he was ordered to pick up the package. The residence where the package was picked up was the residence of Ernest Gonzales, another of Raul's brothers.

12

and had the protection of HPL. Although appellant was an associate of HPL in June 2009, he became a "prospecto" in November 2009.

### b. Bryan Jimenez

Jimenez testified that after his arrest on May 23, 2009, he agreed to be a covert informant for the State under the supervision of Sergeant Eyre and the Special Crimes Unit. Jimenez agreed to make "controlled buys" of drugs, and described the procedure utilized for the "controlled buys." The officers first searched Jimenez's vehicle and attached a recording device to his body. Jimenez would then place a call to a subject— in this case, appellant—arranging the purchase of marihuana; the call was recorded. Jimenez then drove his vehicle to appellant's house to make the purchase. A police officer rode with Jimenez in Jimenez's vehicle, but stayed in the vehicle while Jimenez went inside to make the purchase. Other officers were nearby but out of sight. The recording device both recorded the transaction and broadcast it over a radio signal so the officers could listen to the transaction. Jimenez used money provided by the police to make the purchase. After the transaction, Jimenez would return to the vehicle and hand over the drugs to the officer. Jimenez would meet other officers at a rendezvous point, where his vehicle was searched again. Finally, Jimenez provided the police with a written report describing the transaction.

Jimenez met appellant when he began working for the construction company run by appellant and Raul. Jimenez was frequently paid for his work with drugs. Eventually, Jimenez became an "associate" of HPL. Jimenez defined an associate as "someone that is not particularly in a gang, but has dealings with them, to sell drugs or pick up money—You know, just pretty much anything that gang members do, but not

13

really a member at the time." By engaging in criminal activities, associates assisted the gang and shared in the risks and profits associated with the gang's activities. Some associates became "esquinas" which is a low rank within the gang. A "prospecto" is a higher rank, which requires giving a promise or oath to the gang. The rank above "prospecto" is "carnal," which means that a person has proven himself and has voting rights within the gang.

On May 23, 2009, Jimenez was an "esquina" in HPL. Appellant came to Jimenez's house and asked him to come next door because Raul had a task for him to perform. Raul asked Jimenez to retrieve a package for him from a house that belonged to Raul's brother, Ernest. Segura joined the conversation at appellant's house and was asked to drive Jimenez to pick up the package. Jimenez was to bring the package back to appellant's house. In exchange for performing this task, Jimenez's debt of approximately $480 to Raul would be "wiped clean." Jimenez did not know that Ernest's house was under surveillance by the police. Even if he had known, he might have agreed to retrieve the package because refusing a request from Raul was "not an option." Raul's wife, Cynthia, kept records reflecting attendance, dues payments, and payment of profits to HPL.

Jimenez testified that the marihuana he purchased from appellant belonged to HPL. Appellant obtained marihuana from Raul and sold it for HPL. When a marihuana shipment was received, it would be broken down and repackaged at Raul's house or appellant's house. After he became a covert informant after his arrest, Jimenez shared information with the police. On June 9, 2009, when Jimenez made a controlled purchase of marihuana from appellant, he followed the procedure described earlier.

14

When he made the June 9 purchase, he observed that appellant had approximately ten pounds of marihuana at his house. After he met with officers at the rendezvous point and made his report, Jimenez returned home. He observed appellant and Raul taking a large quantity of marihuana into appellant's home.[8] Jimenez reported this information to Sergeant Eyre. He went over to appellant's house and observed appellant, Raul, and Jeremiah breaking the marihuana into smaller amounts. Later that evening, Jimenez saw appellant, Raul, and Jeremiah loading the marihuana into Raul's Yukon.[9] He saw Raul and Jeremiah leave appellant's house in the Yukon. An hour or so later, appellant told Jimenez that Raul and Jeremiah had been stopped on a traffic stop and arrested. A week or so later, appellant obtained Raul's Yukon from the dealer and began driving it. Using the same procedure used on the earlier purchase, Jimenez made another "controlled purchase" of a half pound of marihuana from appellant on June 14, 2009. The purchase was made at appellant's house; an officer stayed in Jimenez's vehicle when Jimenez went inside. Jimenez also wore a "wire" to a later HPL meeting, at which there was a discussion about the need to pay the HPL suppliers for the confiscated marihuana. Appellant did not attend that meeting; however, he interrupted the meeting to convey a phone call to Jimenez from another HPL member. At that meeting, Jimenez was promoted in rank from "prospecto" to "carnal" because the HPL members believed Jimenez had remained silent after his May 23, 2009 arrest. Jimenez testified that appellant was in charge of a gang of adolescent recruits for HPL.

---

[8] Jimenez later clarified that the marihuana was delivered to appellant's house before he made the controlled purchase.

[9] Another individual, nicknamed "Bullnose," was present and looking out for law enforcement during the loading.

On cross-examination, Jimenez stated that as an "associate" of HPL, appellant was not a member, but was "one step closer to a member." On re-direct examination, Jimenez identified a written two-page renunciation form to be completed if a member wished to renounce membership in HPL. The form requests information regarding names and addresses of the member's family. Jimenez testified that the reason HPL requests contact information for a member's family is, "[b]ecause once you leave the organization, sir, you're a dead man. They know where to find you and where to find your family." Jimenez had never seen anyone fill out such a form. Jimenez testified that even though appellant was an "associate," he had more "say so" and access to information than most other full members because of Raul's rank in HPL.

### c. Officer Gary Wayne Smejkal

Officer Smejkal, formerly an officer with the Victoria Police Department, testified that he learned of appellant through shared conversations with other law enforcement officers concerning gang activity in the area.

### d. Officer Bryan Dowden

Officer Dowden, an officer with the Special Crimes Unit of the Victoria Police Department, was involved in the investigation involving Jimenez as a covert informant. Three officers were actively involved in the investigation. During the investigation, Jimenez provided the police with records obtained from HPL. Officer Dowden testified that appellant and his relatives are confirmed members of HPL. He stated that appellant does business with HPL, receives protection from and provides assistance to HPL, and shares in HPL profits. Officer Dowden did not know appellant's rank within HPL. On cross-examination, Officer Dowden admitted that he was not a gang expert

16

and that his opinion about appellant was based on information obtained from Jimenez and the undercover drug purchases conducted with Jimenez. Officer Dowden admitted that appellant was not named on any of the HPL documents obtained by Jimenez. Officer Dowden stated that he monitored the "body wire" audio of the June 9, 2009 controlled buy between Jimenez and appellant. Officer Dowden testified that he was able to distinguish appellant's voice during the transaction. On June 9, 2009, prior to the controlled buy, the police received information that a shipment of marihuana was received at appellant's house. Pursuant to the information, the police had set up surveillance at appellant's house. Officer Dowden stated that the officers observed the Yukon at appellant's house and departing from the house. Officer Dowden said that he also monitored the "wire" worn by Jimenez during the June 14, 2009 controlled buy from appellant. Officer Dowden was able to hear the transaction as it occurred and recognized appellant's voice as the person who sold Jimenez the marihuana. After the controlled buy, the officers left the vicinity of appellant's residence. They returned, however, after Jimenez alerted them that the marihuana was being loaded into the Yukon. According to Officer Dowden, by the time the officers set up surveillance on appellant's house, the marihuana had been loaded into the Yukon.

On cross-examination, Officer Dowden said that during the controlled buy, he was monitoring the wire and was approximately a block away from the residence. From his position, he could see vehicles coming to or leaving appellant's residence, but could not see the residence.

### e. Alfredo DeLeon IV

DeLeon testified that he was a "captain" in HPL. He stated that appellant is

17

involved in HPL business, including the storage, distribution, and sale of marihuana. On some occasions, appellant attended HPL meetings. DeLeon stated that HPL paid between $100 to $150 per pound of marihuana and sold it for $500 to $600 per pound. After a shipment of marihuana was repackaged, it would be stored at appellant's house or Jimenez's house. In May or June of 2009, appellant was an "esquina" in HPL. Appellant also stored weapons for HPL. DeLeon stated that Raul provided appellant with a vehicle to collect debts for HPL. Appellant had extensive knowledge—more knowledge than higher-ranking HPL members—about HPL's marihuana trade.

On cross-examination, DeLeon said that as an "esquina," appellant was required to make a pledge to HPL. DeLeon confirmed that appellant's name is not listed on any of the HPL documents.

### f. Sergeant Sam Eyre

Eyre, a former sergeant with the Special Crimes Unit of the Victoria Police Department, testified that he was involved in an investigation of HPL in the spring and summer of 2009. Sergeant Eyre testified that he was contacted in May 2009 and advised about the delivery of a package of marihuana. The package carrier, FedEx, had received a tip that the package contained marihuana. The police set up surveillance of the residence where the package was to be delivered and coordinated a controlled delivery of the package. Shortly before the FedEx truck arrived, Sergeant Eyre saw a blue Yukon pass by the house. The FedEx truck arrived, and the Yukon pulled up in front of the residence. A man, woman (later identified as Raul and Cynthia), and small child entered the house. Eyre saw the FedEx driver enter the house with the package; after a minute or so, the driver left and drove away. Raul,

18

Cynthia, and the child immediately followed without the package. Sergeant Eyre alerted other officers to follow the Yukon and continued his surveillance of the residence. A couple of hours later, a blue pickup approached. Sergeant Eyre was positioned to view the front of the residence and several other officers were positioned to view the back of the residence. Sergeant Eyre saw the pickup drop off a man who went into the back yard and returned with the earlier-delivered package. After picking the man up, the truck left the area. Sergeant Eyre followed and requested other officers to execute a traffic stop of the pickup. Following the stop, the package was found to contain approximately twenty-six pounds of marihuana. Elvis Segura, Teresa Segura, and Jimenez were arrested. Jimenez agreed to become a covert informant and engage in controlled purchases of marihuana within HPL.

On June 9, 2009, Jimenez reported that a large quantity of marihuana had been delivered to appellant's house for repackaging. Following the same procedure described earlier, Jimenez made a controlled purchase of marihuana from appellant at appellant's house. Jimenez wore a "wire" during the purchase, and the officers heard the transaction. An officer was in Jimenez's vehicle when Jimenez made the purchase inside appellant's house. Sometime after the purchase had been completed, Sergeant Eyre received another call from Jimenez, notifying the officers that Raul had arrived at appellant's house and the marihuana was going to be moved. Sergeant Eyre set up surveillance of appellant's house and saw the Yukon parked in the driveway. When the Yukon left the residence, Sergeant Eyre requested a traffic stop. Shortly thereafter, a patrol officer made the stop and Raul and Jeremiah were arrested. The officers seized approximately thirty-two pounds of marihuana from the Yukon.

On June 14, 2009, Jimenez made another controlled purchase of marihuana from appellant at appellant's house. On this occasion, an officer waited in Jimenez's vehicle while he went inside appellant's house. Jimenez also wore a "wire" on this occasion and the officers listened to the transaction. Sergeant Eyre identified the substances purchased on June 9 and June 14, 2009 as marihuana. Sergeant Eyre testified that appellant was a member of HPL.

On cross-examination, Sergeant Eyre stated that he inferred that appellant was a member of HPL based on the facts that: (1) marihuana was delivered to appellant's house; (2) less than an hour later, Jimenez purchased marihuana at appellant's house; (3) later that day, the marihuana was loaded into and found in Raul's Yukon; and (4) several days later, Jimenez again purchased marihuana from appellant from the remaining marihuana at appellant's house.

### g. Holly Jedlicka

Jedlicka testified that she is a Crime Scene Unit supervisor with the Victoria Police Department. She testified that based on an analysis conducted by the Department of Public Safety, the substances collected on May 23, June 9, and June 14, 2009 were marihuana.

### h. Chris Garcia

Garcia worked with the Victoria Police Department for 27 years, was employed by the Victoria County Sheriff's Department at the time of trial, and was a member of the Texas Violent Gang Task Force. Based on his experience, information from other gang investigators, and knowledge that appellant's brothers were members of HPL, Garcia believed that in May and June of 2009, appellant was a "prospect" member of HPL.

## 2. Unlawful Possession of Marihuana

We begin by addressing appellant's argument that the evidence is insufficient to show that he unlawfully possessed the thirty-two pounds of marihuana found in Raul's vehicle on June 9, 2009. Appellant was not in the vehicle or at the scene when Raul and Jeremiah were arrested and the marihuana was seized. Appellant contends that Jimenez's uncorroborated testimony is the only evidence that he was present when the marihuana was loaded into Raul's vehicle. According to appellant, there is no evidence that he "was involved in the distribution of drugs with his brother or any other member of the HPL, except for the uncorroborated testimony of Mr. Jimenez . . . ."

The State argues that the following evidence links appellant to the marihuana: (1) Sergeant Eyre's testimony that he observed Raul's Yukon parked in appellant's driveway and followed the vehicle when it left appellant's house shortly before it was stopped; and (2) Jimenez's testimony that he saw appellant (a) unloading a large amount of marihuana from the Yukon into his house, (b) repackaging the marihuana into smaller bundles, and (c) helping Raul and Jeremiah reload the repackaged marihuana back into the Yukon. The State also argues that additional circumstances linking appellant to the marihuana include: (1) Raul is the leader of HPL in the Victoria area; (2) appellant is Raul's brother, is an HPL associate; and sold marihuana for HPL; and (3) DeLeon's testimony that after Raul's arrest, appellant drove the Yukon as he collected marihuana proceeds for HPL.

Because appellant was indicted as a party, the State could establish the "possession" element either by showing that appellant acted on his own or by showing that he acted with the intent to promote or assist the offense by soliciting, encouraging,

21

directing, aiding, or attempting to aid Raul and Jeremiah in the commission of the offense. *See* TEX. PENAL CODE ANN. §§ 7.01, 7.02. In conducting our legal sufficiency review, we are not required to exclude informant testimony or accomplice testimony. *See Taylor v. State*, 10 S.W.3d 673, 684 (Tex. Crim. App. 2000) ("Accomplice witness testimony can be sufficient to support a conviction under the legal sufficiency standard dictated by *Jackson v. Virginia*") (citation omitted).

Jimenez's testimony established that on June 9, 2009, he observed appellant and Raul move a large quantity of marihuana into appellant's home for repackaging. Jimenez went to appellant's house and saw appellant, Raul, and Jeremiah repackaging the marihuana. Later that evening, Jimenez saw appellant, Raul, and Jeremiah reloading the marihuana into Raul's Yukon. An hour or so after the Yukon left appellant's house, appellant told Jimenez that Raul and Jeremiah had been arrested. Jimenez's testimony alone is sufficient to establish the "possession" element by showing that appellant acted with the intent to aid Raul and Jeremiah in the commission of the offense. Based on our review of the record, we hold that a rational jury could have found beyond a reasonable doubt that appellant acted with the intent to aid Raul and Jeremiah in possessing the marihuana.

### 3. Sufficiency of the Evidence that Substance was Marihuana

Appellant also argues that the evidence is insufficient to establish that the substance confiscated in the traffic stop on June 9 was marihuana. Specifically, appellant contends that because "the analysis performed on the confiscated evidence was a microscopic analysis" and "no confirmatory test [was] performed, . . . it cannot be conclusively determined that the substance was marihuana."

22

We find appellant's argument to be without merit. Sergeant Eyre testified that State's Exhibit 46 is the laboratory analysis regarding the substance seized in Raul's vehicle on June 9, 2009. Sergeant Eyre testified that he examined the substance seized in the traffic stop and determined that it was marihuana. Ruben Rendon, a chemist with the Department of Public Safety crime laboratory in Corpus Christi, testified that Donald Thain, who subsequently retired, conducted the microscopic analysis of the substance seized in the June 9 traffic stop; Officer Rendon reviewed Officer Thain's analysis. Both concluded that the substance was marihuana. Officer Rendon testified that both a microscopic analysis and a Duquenois-Levine chemical test were conducted on the substance. Officer Rendon explained the procedure involved in the Duquenois-Levine test and testified that the procedure is accepted within the field. We conclude that Officer Rendon's uncontroverted testimony was sufficient to establish that the substance confiscated in the June 9 traffic stop was marihuana.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have determined beyond a reasonable doubt that appellant committed the underlying offense of possession of marihuana.

### 4. Intent to Participate as Member of a Criminal Street Gang

Appellant also challenges the sufficiency of the evidence to prove the second element of engaging in organized criminal activity: that he had "the intent to establish, maintain, or participate . . . as a member of a criminal street gang." *See* TEX. PENAL CODE ANN. § 71.02(a). Appellant argues that the evidence is insufficient because law enforcement officers' testimony that he was a member of HPL was "speculation" based

23

on "a theory of guilt by association." Appellant asserts that the jury was asked to find he was a member of HPL simply because of Raul's leadership role in HPL.

The State responds that it was not required to establish appellant's rank or official membership in HPL; rather, it was required to establish that appellant intended to participate as a member of HPL when he committed the offense. *See Jackson v. State*, 314 S.W.3d 118, 124–25 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("[T]he State had the burden to prove beyond a reasonable doubt that appellant committed the underlying offense of aggravated robbery or robbery with the intent to establish, maintain, or participate as a member of a criminal street gang."). "The core component of the second element is appellant's intent to act as part of a criminal street gang." *Id.* at 127. The State contends there was ample evidence that appellant participated in criminal activities involving HPL, including that he regularly sold HPL marihuana and did so on the two controlled buys to Jimenez, and that the marihuana seized in the Yukon on June 9 belonged to HPL.

As noted above, in conducting our sufficiency review, we do not exclude informant testimony or accomplice testimony. *See Taylor*, 10 S.W.3d at 684. Segura testified that: (1) it was discussed at HPL meetings that appellant was moving marihuana for Raul; (2) HPL marihuana was regularly repackaged at appellant's house; (3) appellant stored guns for HPL at his house; and (4) Segura purchased HPL marihuana from appellant on several occasions. Jimenez testified that: (1) the marihuana he purchased from appellant on two "controlled buys" was HPL marihuana; (2) appellant sold marihuana for HPL; (3) on June 9, he observed appellant and Raul move a large amount of marihuana into appellant's house; (4) he observed appellant,

24

Raul, and Jeremiah repackaging the marihuana; (5) he saw the repackaged marihuana loaded back into Raul's vehicle; (6) he saw Raul and Jeremiah leave appellant's house with the marihuana in Raul's vehicle; and (7) appellant had more "say so" and access to information than most full members of HPL because of Raul's rank in HPL. Officer Dowden testified that: (1) he monitored the "body wire" audio of the June 9 and June 14 controlled buys of marihuana from appellant and identified appellant's voice during the transactions; and (2) on June 9, he and other officers saw Raul's Yukon at appellant's house and saw it leave the house shortly before the traffic stop. Sergeant Eyre testified that: (1) on June 9, he observed Raul's Yukon parked in appellant's driveway; (2) when the Yukon left, he requested a traffic stop of the vehicle; and (3) he inferred appellant was a member of HPL based on the facts that marihuana was delivered to appellant's house on June 9, Jimenez made a controlled buy less than an hour later, and the same day, the repackaged marihuana was loaded back into Raul's vehicle from appellant's house. Garcia testified that based on information from other gang investigators, appellant was a "prospect" member of HPL in May and June of 2009.

Viewing the evidence in a light most favorable to the jury's verdict, we conclude that the evidence is sufficient to show that appellant committed the underlying offense of possession of marihuana with the intent to participate as a member of a criminal street gang. *See* TEX. PENAL CODE ANN. § 71.02(a); *see also Chaddock v. State*, 203 S.W.3d 916, 921–922 (Tex. App.—Dallas 2006, no pet.) (holding evidence legally sufficient to support participation as gang member where appellant associated with known gang members, had identifying tattoos, and acted in conformity with gang's behavior).

**5. Insufficient Corroboration**

25

We now turn to appellant's argument that the testimony of Jimenez, Segura, and DeLeon was not sufficiently corroborated under articles 38.14 and 38.141. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14, 38.141. Because we apply the same standards governing the accomplice-witness rule to the covert-witness rule, *see Malone*, 253 S.W.3d at 258, we must ignore the testimony of Jimenez, Segura, and DeLeon, and examine the record to see if any other evidence tended to connect appellant with the offense committed. *See id.*; *Cantelon*, 85 S.W,3d at 461.

If we eliminate the testimony of Jimenez, Segura, and DeLeon, we are left with the following inculpatory evidence. Officer Dowden testified that he monitored the "body wire" audio of the June 9, 2009 controlled buy between Jimenez and appellant at appellant's house and identified appellant's voice during the transaction. He and other officers observed the Yukon parked in appellant's driveway and when it left the house shortly before the traffic stop. Officer Dowden also monitored the "body wire" audio of the June 14, 2009 controlled buy between Jimenez and appellant at appellant's house and identified appellant's voice during the transaction. Sergeant Eyre testified that he and other officers listened to the controlled buys between appellant and Jimenez on June 9 and June 14. After the controlled buy on June 9, the officers set up surveillance at appellant's house and saw the Yukon parked in appellant's driveway. Sergeant Eyre followed the Yukon when it left appellant's house and requested a traffic stop. Officer Garcia, an officer with 27 years of experience with the Victoria Police Department and a member of the Texas Violent Gang Task Force, testified that based on his experience and information from other gang investigators, he believed that appellant was a "prospect" member of HPL in June 2009. The evidence establishes that appellant sold

26

marihuana to Jimenez at appellant's house hours before the marihuana left appellant's house in the Yukon and was seized moments later in the traffic stop. It also establishes that appellant continued to sell marihuana at his home after June 9.

Considering, as we must, the combined force of all of the non-accomplice and non-covert witness evidence that tends to connect appellant to the offense, *see Smith*, 332 S.W.3d at 442, we conclude that the State has provided some non-accomplice and non-covert witness evidence that tends to connect appellant to the commission of the offense alleged in the indictment. Having found that the evidence was legally sufficient and that the accomplice-witness and covert-witness testimony was sufficiently corroborated, we overrule appellant's first issue.

### III. ADMISSION OF EVIDENCE

By his second issue, appellant contends that the trial court improperly admitted certain evidence in violation of rule 403 of the Texas Rules of Evidence. *See* TEX. R. EVID. 403 (providing that otherwise admissible evidence may be excluded when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice). Specifically, appellant complains that the trial court improperly admitted: (1) evidence that HPL would kill witnesses who testify against the gang or attempt to leave the gang; (2) evidence that appellant stored guns for HPL; and (3) evidence that HPL had treaties with other street gangs.

First, regarding his complaint about testimony that HPL would kill accomplice witnesses who testify against the gang, appellant identifies testimony by Segura:

Q [Prosecutor]:     Is it in the "HPLs" rules and obligations, is there something that talks about if members cooperate with law enforcement?

A [Segura]:     Yes, sir.

Q:     What do the rules say about cooperating with law enforcement?

A:     They'll be killed. It could be you, it could be your family members. Whoever they get to first.

Q:     Do you have an agreement with "HPL," where you will not be killed following your testimony?

A:     No, sir.

Q:     Do you think there will be a time when you won't have to look over your shoulder?

[Defense counsel]:     Objection— Speculation.

A:     I—

[the Court]:     Well—

[Prosecutor]:     I'll withdraw the question.

Similarly, appellant complains of the following testimony by Jimenez:

Q[Prosecutor]:     Now, if a person fills out this form to leave the organization, why do you think they would ask for the names and addresses and contact information of your family, if you're not going to be a member any more? (Indicating)

A[Jimenez]:     Because once you leave the organization, sir, you're a dead man. They know where to find you and where to find your family.

Q:     Have you seen anybody fill one out?

A:     No, sir, I have not.

Q:     Based on your experience and time with the organization, would that organization do anything to keep people from testifying against them?

[Defense counsel]:     Objection—Speculation.

28

| [Prosecutor]: | Based on his training and experience in the organization, your Honor. |
|---|---|
| [Court]: | Overruled. |
| A [Jimenez]: | Yes, sir. |

The State argues that in both instances, appellant failed to preserve any alleged error under rule 403. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2011). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.* If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). "A timely and specific objection is required to preserve error for appeal." *Luna v. State,* 268 S.W.3d 594, 604 (Tex. Crim. App. 2008). "If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited." *Id.* Furthermore, improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point in the trial. *See Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (noting that any preserved error with respect to admission of complained-of evidence was harmless in light of "very similar" evidence admitted without objection); *Prieto v. State*, 337 S.W.3d 918, 922 (Tex. App.—Amarillo 2011, no pet) (citing *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010)). "[A]ppellate arguments must correspond with the objection at trial." *See Butler v. State*, 872 S.W.2d 227, 236 (Tex. Crim. App. 1994).

The State argues appellant failed to preserve any error regarding both of the complained of passages because counsel's "speculation" objection did not preserve an objection under rule 403. Even if appellant's "speculation" objections had preserved his rule 403 objections, we conclude that in both instances, appellant failed to preserve any issue because his objections were untimely. In both instances, appellant did not object until after an objectionable question had been asked and answered. *See Luna*, 268 S.W.3d at 604. With regard to Segura's testimony, Segura had already testified that cooperating HPL members would be "killed"; counsel objected to a question regarding whether Segura would be "look[ing] over [his] shoulder." Similarly, Jimenez had already testified that when an HPL member leaves the gang, he is "a dead man"; counsel objected to a question regarding what retaliatory action the gang would take to prevent members from testifying against the gang. Appellant's objections were therefore untimely and any claim of error is forfeited. *See id.* Moreover, we note that similar evidence was admitted without objection. *See Estrada*, 313 S.W.3d at 302 n.29. At another point in Segura's testimony, the prosecutor questioned him about his agreement with the State to testify. Segura was asked, "So, at that point, you were asked to give testimony against the people that were planning on killing you; is that correct?" Segura replied, "Yes." There was no objection to this testimony. *See id.*

Second, appellant also complains that three separate allegations that he engaged in firearm distribution and storage for HPL "were substantially more prejudicial than probative" and were not appropriately corroborated. Specifically, appellant complains of testimony by Segura, DeLeon, and Jimenez that appellant stored guns for HPL. Appellant identifies the following passage from Segura's testimony:

30

| Q[Prosecutor]: | Did Jesus Zavala provide other things for the "HPL," storage of things? |
|---|---|
| A[Segura]: | Guns. |
| Q: | Why would Jesus Zavala store guns at his sister's house? |
| [Defense counsel]: | Your Honor, I would object, under Rule 403, relevance. |

Following a bench conference, the trial court overruled appellant's objection.

Appellant also identifies testimony by DeLeon. The prosecutor asked DeLeon, "Did Jesus Zavala ever store anything, other than marijuana, for Raul Gonzale[s] and the HPL?" DeLeon responded, "At one point, he stored weapons." There was no objection to this testimony.

Appellant also complains of Jimenez's testimony regarding what he observed being loaded into Raul's vehicle on June 9:

| Q[Prosecutor]: | During the process of loading the vehicle, was anything but marijuana loaded or attempted to be loaded? |
|---|---|
| A[Jimenez]: | I believe there was some— |
| [Defense counsel]: | Objection to relevance, your Honor. |
| [Prosecutor]: | Your Honor, I believe what was being loaded or attempted to be loaded into the vehicle is relative [sic]. |
| [Court]: | Overruled. |
| Q[Prosecutor]: | Was there anything besides the marijuana that was being loaded or attempted to be loaded into the vehicle? |
| A: | Yeah. They were going to load some firearms, but they decided not to take those with the marijuana, sir. |

Even if we assume, without deciding, that appellant preserved error with his objections to Segura's and Jimenez's testimony, the error, if any, was harmless because he did not object to DeLeon's testimony that appellant stored guns for HPL. *See Estrada*, 313 S.W.3d at 302 n.29. We overrule appellant's rule 403 complaint regarding the testimony that appellant stored guns for HPL.

Third, appellant complains that DeLeon's testimony that HPL entered treaties with two other gangs in the area "was substantially more prejudicial than probative." Appellant acknowledges that the trial court did not admit State's Exhibit 35—a treaty between the "Raza Unida" prison gang and HPL—into evidence. However, appellant complains that "[t]he jury already heard the damaging statements about the treaties and why they come into existence." According to appellant, "Evidence that gangs are entering treaties in the community and fighting over distribution rights was likely used by the jury in an impermissible manner."

The State argues that appellant failed to preserve any error because his objection to State's Exhibit 35 was based on relevance, not rule 403. We have examined the record and have been unable to identify *any* objection to State's Exhibit 35. During DeLeon's testimony, the State offered Exhibits 36 and 37. Appellant objected on relevance grounds. At a bench conference, appellant's counsel asked for a running objection to State's Exhibit 42. The trial court admitted several other exhibits offered by the State. The State then offered State's Exhibit 35 and the trial court stated it "will take that under advisement at this time" and "review the exhibit." The prosecutor questioned DeLeon about treaties between HPL and other gangs, eliciting testimony that gang wars typically involved fighting over distribution rights and sources of

32

narcotics. The trial court then "sustained the running objection on State's Exhibit 35." The prosecutor then questioned DeLeon, without objection, regarding treaties between HPL and the "Texas Syndicate" and between HPL and the "Mexican Mafia."

The State argues that even if we construe appellant's running objection as applicable to State's Exhibit 35, appellant's relevance objection did not preserve an objection under rule 403. The State also argues that any error in the admission of DeLeon's testimony regarding the treaty between HPL and "Raza Unida" was rendered harmless by his unobjected-to testimony regarding treaties between HPL and the "Texas Syndicate" and the "Mexican Mafia."

We agree. Appellant has not directed us to any place in the record and we have not found any objection to DeLeon's testimony about treaties between HPL and other gangs on the basis of rule 403. Thus, no issue was preserved regarding DeLeon's testimony. *See Sony v. State*, 307 S.W.3d 348, 356 (Tex. App.—San Antonio 2009, no pet.) (holding that a relevancy objection failed to preserve an objection under rule 403); *Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); (noting that a rule 403 objection is not implicitly contained in a relevancy objection and that a specific rule 403 objection must be raised to preserve error). We conclude appellant failed to preserve any issue regarding DeLeon's testimony about treaties between HPL and other gangs. We overrule appellant's second issue.

## IV. JUROR MISCONDUCT

By his third issue, appellant contends that reversible error occurred during trial when it was established that one of the jurors had an unauthorized conversation with Officer Smejkal. The trial judge had observed a juror conversing with Officer Smejkal in

the hallway and questioned Officer Smejkal at a bench conference. Officer Smejkal stated he had a brief conversation with an acquaintance that he knew from his affiliation with the Victoria County Livestock Show. Officer Smejkal stated that he had inquired about the progress of an animal owned by the juror. He had not mentioned or discussed the case. The only question asked by defense counsel was whether the juror was wearing a juror tag. Officer Smejkal responded that she was not and he did not know she was a juror. Defense counsel moved for a mistrial "based upon him talking with the juror and based upon the fact that she could have some bias towards Gary Smejkal that could affect her in this case." The trial judge did not rule on the request and the trial continued.[10]

Appellant has the burden of proving the allegation of juror misconduct. *Contreras v. State*, 54 S.W.3d 898, 907 (Tex. App.—Corpus Christi 2001, no pet.) (citing *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000)). When a juror engages in an unauthorized conversation, injury is presumed. *Id.* This presumption is rebuttable by a showing that the case was not discussed or that nothing prejudicial to the accused was said. *Id.*

Here, Officer Smejkal testified that he and the juror did not discuss the case in any way. Appellant presented no evidence to the contrary and did not establish any basis for the juror's alleged possible "bias." Accordingly, the presumption of harm arising from the juror and Officer Smejkal's unauthorized conversation was rebutted by a showing that the case was not discussed. *See id.* We overrule appellant's third issue.

### V. IMPROPER JURY ARGUMENT

---

[10] The State asserts that appellant preserved the issue by raising it in a motion for new trial.

By his fourth issue, appellant contends that the prosecutor engaged in improper jury argument when, referring to the State's covert and accomplice witnesses' testimony, he stated, "And beyond that deal [between the witness and the State], what do you have?  Virtually, their death sentence, if they're caught."  Appellant argues that this statement inappropriately bolstered the testimony of the State's witnesses.

The State argues that appellant failed to preserve any issue because he did not object to the prosecutor's statements at trial.  We agree.  The record reflects that defense counsel did not object to the referenced statement or any other statement made by the prosecutor during his closing argument.  A defendant's failure to object to a jury argument forfeits his right to complain about the argument on appeal.  *Cockrell v. State*, 993 S.W.2d 73, 89 (Tex. Crim. App. 1996); *Benn v. State*, 110 S.W.3d 645, 650 (Tex. App.—Corpus Christi 2003, no pet.).  We hold that appellant failed to preserve any issue regarding improper jury argument.  *See Cockrell*, 993 S.W.2d at 80.  We overrule appellant's fourth issue.

## VI. CONCLUSION

We affirm the trial court's judgments .

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
23rd day of February, 2012.